GRACE EASTER, by Next Friend v. C. N. O. & T. P. RY. CO.
and
GEORGE P. EASTER v. C. N. O. & T. P. RY. CO.

Eastern Section.    September 25, 1925.

No petition for Certiorari was filed.

1. **Appeal and error. On appeal from a directed verdict for the defendant, the Appellate Court will interpret all evidence in favor of the plaintiff.**
On an appeal from a directed verdict for the defendant, the Appellate Court will interpret all the evidence in favor of the plaintiff, and if, under

such a construction, the evidence shows no disputed fact the verdict should be directed for the defendant.

2. **Negligence. Evidence. Evidence held to show contributory negligence barring a recovery.**

In an action to recover for damages for injuries sustained in a collision with a train where the evidence showed that the plaintiff started to cross a double track immediately after a long freight train had passed on one track, and the evidence further showed that the plaintiff saw the approaching train on the other track in time to have stopped, but proceeded across the track in an effort to cross ahead of the train, held that such action constituted negligence such as would bar a recovery.

Appeal in Error from Circuit Court, Roane County; Hon. S. C. Brown, Judge.

Affirmed.

J. W. Stone, of Harriman, for plaintiff in error.

H. M. Carr, of Harriman, for defendant in error.

SNODGRASS, J.    These two suits were consolidated and heard together.    They grew out of the collision of one of the passenger trains of the defendant with an automobile in which the plaintiff Grace Easter was riding, and also driving, and in which she sustained injuries, for which she sues, through her father as next friend, asking for $5000 as damages.

The father brings his action for the loss of her services during the time she was disabled by reason of the injuries, and for the medical bill incurred for attention of the doctor in such affliction, all of which he placed at the sum of $2500.

Plaintiff Grace Easter in her declaration substantially alleges that the defendant is a railroad corporation, operating a line of railroad carrying freight and passenger traffic from Cincinnati in the State of Ohio through Kentucky and Tennessee to Chattanooga, Tennessee, and through Roane county in said latter State, where, it alleged, it maintained agents, and had upon its railroad tracks locomotives and trains of cars, which it operated daily in said traffic, both in Tennessee and Kentucky; that on August 31, 1923, the plaintiff was riding in an automobile on the public highway in the State of Kentucky, and approaching the tracks of the defendant at a public crossing at and near a point in the State of Kentucky known as Science Hill, with the view of crossing said railroad tracks, and was then and there in plain view of the engineer, who was the servant and vice-principal of the defendant, and within a few feet of the tracks, and so close to said railroad tracks as to make it plain to those in charge of the engine on the train of the defendant that she and those accompanying her were about to cross the tracks, and that a collision was imminent, and that the engineer, the servant and vice-principal of the defendant failed to give any warning of

the approaching train, or make any effort to stop the train and prevent an accident, notwithstanding the fact that where she was first seen by said engineer, or should have first been seen by him, was within a few feet of said railroad tracks, and so located as to make it plain to any one that an accident was imminent; that owing to the location of the tracks and to the weeds and other things growing at the side of the road, and on the right-of-way, the crossing being on a fill and up grade, and above those on the public highway, the view of the plaintiff and those accompanying her, and who were near the said railroad tracks, was cut off, until they were unable to see the approaching train until they were right on the track, but the engineer from his place on the engine could or should have seen the approaching automobile plainly and in time to have given the alarm and checked the train and prevented the accident. Plaintiff charges that it was the duty of said engineer, the servant and vice-principal of the defendant, to give warning of the approaching train, which he carelessly, recklessly and negligently failed to do; that the plaintiff was driving the automobile and riding on the front seat, and with her was a young man, who was killed in the accident, and on the rear seat of said automobile was Dovey Bennett, who was also killed in the accident, and riding also on the back seat was Oakie Burton. It was further averred that before going on the tracks that she and those accompanying her looked and listened for any approaching train, but owing to the obstruction of the view were not able to see, and did not hear the said train, and that she drove the automobile on the track, when the defendant, through its agents, servant and vice-principal, ran its engine and train of cars over and against her person, bruising, mangling, crushing her body, head and limbs, causing her to suffer great mental and physical pain and anguish, all without fault or carelessness on the part of the plaintiff, but due to the carelessness and recklessness of the servant and vice-principal of the defendant. It was further averred that the train of defendant approached at an excessive, high, negligent and reckless rate of speed, said train being one of the fast trains of the defendant; whereof she sues the defendant for $5000, etc., etc.

The declaration of the plaintiff George P. Easter was substantially that of his daughter Grace Easter, altered simply in verbiage so as to conform to the character in which the suit was maintained and the damages alleged; it being averred that by reason of the injury of his said daughter Grace Easter by the defendant he was deprived of her services for a long period of time, and was compelled to expend large sums of money for doctors' bills, medicines and nursing for said daughter, trying to restore her to health; wherefore the plaintiff sues the defendant for $2500 damages, etc., etc.

Pleas of not guilty being entered the causes came on for trial as stated before the judge and jury, and at the proper season a motion was entered by the defendant for a directed verdict in the causes, which, upon being argued, was sustained by the court, and under said direction a verdict in favor of the defendant was entered. Motion for a new trial being had and overruled, plaintiffs appealed and have assigned errors.

## I.

"That the trial court erred in sustaining the motion of defendant to instruct the jury to render a verdict in favor of the defendant, and in granting said peremptory instruction."

## II.

"Because the undisputed facts in this case preponderate in favor of the plaintiff, and show liability on the part of the defendant."

## III.

"Because there was disputed evidence in the record that should have been passed on by the jury."

The background and surroundings of this fateful accident are visualized from the undisputed evidence, except in the particulars negatived by the plaintiff alone, and they are that on the 30th day of August, 1923 this line of railroad mentioned in the declaration was being operated by the defendant over the section of road where this collision with its tragic results occurred. The place of this crossing was at or near Science Hill, a village or town in the State of Kentucky, about six miles from Somerset. This section of the road was double tracked, and the pike out of Somerset in the neighborhood of this crossing ran parallel with the railroad, and about fifty yards from it, until about opposite the crossing it turned at right angles, or nearly so, in the direction of, crossed the railroad and again turned parallel. This pike evidently was a much traveled thoroughfare, and at this crossing the railroad had installed automatic danger signals, electrically arranged, so that when a train came upon the block, or at a certain distance on either side approaching the crossing, a bell would ring and an arm signal would wave. Trains were operated on the east track going north and on the west track going south, and these danger signals were in operation at the time of the accident. The little sketch appended indicates approximately the situation of the pike as it paralleled and then crossed the railroad tracks.

N

W

E

S

Between the rails the width is 4 feet 8 inches, and between the tracks the width is 9 feet. There is another crossing located at about 500 feet south of the one where the accident occurred, and about this crossing is the place marked where under the rules they blow the signal for the crossing where the accident occurred, two long, and two short blasts of the whistle. The signal was blown on the train which did the injury at the proper place. As the train approached the crossing where the accident occurred, and when within about 300 feet of the crossing, the fireman on the train going north saw the automobile approaching the south main line from the west, and this, too, as soon as the rear end of the freight car passing on the south main line got out of the range of his vision. He hallooed to the engineer, who he thinks could not see because of the obstruction of the front of the locomotive they were driving, to sound the alarm whistle, which the engineer did, and was sounding such whistle when the engine passed over the crossing, striking the automobile.

When the fireman saw that the automobile was not going to stop, he himself, because it could thus be done quicker, jumped to and applied the emergency brakes, by which time the train was within about 150 feet of the crossing, too late to stop the train, which came to a standstill about 450 feet from where the brakes were first applied, and after the train had passed over the crossing and effected the injury. The car in the meantime had nearly passed over the crossing, and was struck toward its rear end and hurled over on the east side of the track, which also indicated that it had passed more than half way over. A young man by the name of Coleman sitting in the front seat with the driver (the plaintiff) was killed, and a young lady sitting on the back seat with witness Oakie Burton was also killed. The young man in the back seat jumped out when he saw the train and landed between the rails of the south main on his stomach, thus showing where the car was when he left it. The plaintiff attempted to jump out about the time the train struck the automobile, and for some reason was not killed, but sustained some injuries, descriptive of which she testified:

"Well, I got my head hurt, and I got bruised all over, mashed and bruised, and a place on my ankle was cut."

She said the first thing she knew was climbing over the stock gap, and came back into the pike, and some man grabbed her. Her arms and legs were bruised badly. Her leg came very near breaking, and was discolored, the skin turning black. She was taken to the hospital and stayed three or four hours, and came back to Harriman, Tennessee, her home, that night, but for some weeks was under the care of a doctor; and her father thus lost her services for that time, and incurred obligations of doctors' bills, which he estimates in the sum of twelve to fifteen dollars.

All the proof except that of the plaintiff, Grace Easter, established that when the turn was made on the pike approaching the crossing there was nothing whatever that might have obstructed the vision or to prevent anyone from seeing the approaching train for a long distance to the south except a freight train passing on the south main. Plaintiff denied that any such train was there, and maintained that she was struck on the first track she approached, which was the south main, until finally, under the stress of the examination, she was induced to say that she did·not remember on which track she was struck, but that she was on the track before she saw the train.

The testimony of Oakie Burton and that of the dining car conductor, dove-tailing with that of the fireman and other eye witnesses, shows why and how this accident occurred. The young people had known each other but a short time, and met up in the fair grounds, when an automobile ride was proposed. The plaintiff, to say the least of it, was not under the best reputation, asked to be and was

allowed to drive the car, a Studebaker. Mr. Coleman, the owner
of the car, was riding with her in the front seat. The witness Oakie
Burton and the other young lady were riding in the back seat.
Burton's account of the accident was graphic, and is inserted here,
as follows:

"Q. Are you the Oakie Burton that was in this car when two
people were killed and another was injured at Science Hill in
August of last year? A. Yes sir."

"Q. In what part of the car were you riding? A. The back
seat, left side."

"Q. Who was with you on that seat? A. Dovey Bennett."

"Q. Who was on the front seat? A. Robert Coleman and
Gracie Easter."

"Q. Robert Coleman is dead? A. Yes sir.".

"Q. Robert Coleman worked at the same shops you did at
that time? A. Yes sir."

"Q. Who was driving the car? A. Gracie Easter."

"Q. Well, where had you young people started to go that
day? A. We were just riding around."

"Q. Riding around? A. Yes sir."

"Q. Where did you see these girls, and where did you get
with them? A. At the fair grounds."

"Q. The fair grounds there at Somerset? A. Yes sir."

"Q. Had you known these girls before that? A. Yes sir,
I had seen them before that."

"Q. Where did you first know them? A. On Number Six,
the Saturday before that."

"Q. Did you get acquainted with them when you were down
at Harriman playing ball that summer? A. Didn't get ac-
quainted at Harrimon, got acquainted with them after they
got on the train."

"Q. Where were they going? A. They said they were going
to Danville."

"Q. You had been down here on Saturday before that? A.
Yes sir."

"Q. And this was on Sunday morning, wasn't it? A. Yes
sir, on Sunday morning, on Number Six."

"Q. Now then, you met up with them again, you say, at the
fair grounds? A. Yes, sir."

"Q. Who suggested that you have an automobile ride? Do
you remember? It does not make much difference. A. It was
one of us, I don't remember who it was."

"Q. Did they consent to it readily? A. Yes sir."

"Q. You all started out up the pike toward Danville, Ky?
A. Yes sir, we were going toward Danville."

"Q. Who was driving the car when you left the fair grounds?
A. Mr. Coleman."

"Q. Was there any change in the drivers before you reached
Science Hill? A. Yes sir."

"Q. Who suggested the change? A. She asked him to let
her drive the car."

"Q. That is, Gracie Easter did that? A. Yes sir." ·

"Q. And he was willing? A. I reckon he was, or she would
not have been driving."

"Q. Now on approaching the crossing at Science Hill, do
you remember about how far the turn in the pike is from the
railroad where it turns to go up to the railroad crossing? A.
From what?"

"Q. From the turn up to the track, how far is that? A.
Well, I judge about 50 yards or more."

"Q. 50 yards or more. Now as you approached this track
going down the pike and made that turn approaching the track,
was there a train on the south main? A. Yes sir, there was,
a freight train going south."

"Q. Passing over that crossing? A. Yes sir, after we had
turned that curve there."

"Q. How fast was that train running? A. Well, I am not
much of a judge of speed."

"Q. Was it making good speed? A. Yes, it was going
pretty fast."

"Q. It was going through there at a pretty fast rate? A.
Yes sir."

"Q. How close were you to the crossing when the caboose
of the freight train cleared it, passed there. A. Oh we were, oh
pretty close."

"Q. About how close? The jury does not know what you
mean. A. I don't know; I would not say."

"Q. You would not say how far, but you were somewhere
between that curve and the crossing when it passed? A. Yes
sir."

"Q. What kind of ground is it from the curve up to the
crossing? A. When you first get on it; it is pretty rough."

"Q. On what? A. On the curve. It is tolerable rough.
But they fixed it in there on that crossing; they fixed it up all
right. It was a kind of gradual grade, a small grade, but it
had been fixed up before that happened." .

"Q. From the south main track here, was it level for a
distance from the south—on the west side was it level, or was
it a grade clear up to the railroad? A. No, it was kind of level
after you got up next to the track."

"Q. How far did that level stretch extend? A. About ten feet, I guess."

"Q. When you came up to that crossing, and after that freight train had passed it, were you looking south and north for trains coming along? A. I was not, no sir. I do not know whether they were or not. I was not."

"Q. You were not? A. No sir."

"Q. I will ask you to state, after you got up here, within ten or fifteen feet of the south main line there, if there was any obstruction for ten or fifteen feet away, looking south down that track, to keep a person from seeing? A. You mean if there was anything between there?"

"Q. Anything located in there, trees, banks or houses, anything to obstruct the view. A. No sir."

"Q. If you had looked down south could you have seen a train coming up for quite a distance? A. Yes sir,"  .

"Q. Within ten feet of that crossing there? A. Yes, you could see."

"Q. When you got in ten feet of it, how far was the freight train away from you? A. Oh, it was about 100 feet or more."

"Q. And as it passed out of the way, did that increase or not, your opportunity to see whether or not there was a train on the other track? A. Yes sir."

"Q. Did you see this passenger train coming? A. No sir, I did not see it until somebody said "there comes a train.""

"Q. You did not see it? Had you been looking for one? A. No sir."

"Q. Where were you when somebody said—What was it they said? A. Here comes a train."

"Q. Whereabouts were you when somebody in that car said 'here comes a train?' A. In the back seat."

"Q. I mean, where were you with reference to the crossing? A. It was up very close to the first track; the front wheel might have been within about three feet, I guess."

"Q. How fast was that automobile running? A. About ten miles an hour."

"Q. When you got the front wheels up on the rail of the south main line, somebody in your car hollered 'here comes a train?' A. Yes sir."

"Q. Then what occurred? A. One of them said 'step on it.'"

"Q. Who said it? A. Coleman, I think."

"Q. What did you understand that to mean? A. I thought it meant to beat it across."

"Q. What did you do; did you rely upon her stepping on it for your safety, or what? A. No sir, I looked when they said 'here comes a train,' and I thought pretty quick and jumped out. I figured they could not make it. That was in my mind at the time."

"Q. Did you notice at the time Coleman said 'step on it' whether or not the speed of your car increased any? A. No sir, I do not remember."

"Q. Did you notice Grace, to see whether after Coleman said 'step on it' what she did? A. No sir, I didn't."

"Q. You didn't see it? A. No sir."

"Q. You were looking out for number one? A. Yes sir."

"Q. Did you see her—After you made this effort to get out, did you see her movements at all? A. No sir, I didn't notice anybody's movements, I jumped out and fell on my stomach."

"Q. Did you notice what part of this automobile had been struck by the engine? A. Yes sir, it was hit at the rear door and wheel."

"Q. On which side of the track had it been left? A. On the east side."

"Q. Was that on the opposite side from which the car was approaching? A. Yes sir."

. . . . . . .

"Q. How close was the passenger train to the crossing when you saw it? A. Oh, it was 100 to 150 feet, I think."

"Q. 100 to 150 feet? A. Yes sir."

"Q. And you didn't look in that direction until someone said 'here comes a train?' A. No sir."

"Q. And then you did look and saw it? A. Yes sir.

Cross-Examination.

"Q. Now when you got there and were making that turn, the freight train you say was on the crossing? A. Yes sir, it was going south."

"Q. The freight train was going south, and was crossing the crossing when you made the turn out here—that freight train was right across the pike at the time the car made the turn out here, was it, or not? A. No, not exactly, it was coming, and we could see it when we made the curve up there."

"Q. The freight train had not gotten up here, and was not across the pike when you made the turn? A. Immediately after we made the turn it had it blocked.

"Q. It had it blocked immediately after you made the turn? A. Yes sir."

"Q. How fast did you say you were running? A. About ten miles an hour."

"Q. And you think it was about 100 to 150 feet from this turn here up to the railroad track, or 50 yards? A. About 50 yards."

"Q. That would be 150 feet? A. Yes sir."

"Q. And immediately after that this train had it blocked? A. Yes sir."

"Q. And by the time you got up here, that freight train had gotten across there, had it? A. Yes sir."

"Q. And was coming on down? A. Yes sir."

"Q. And when somebody said 'there comes a train,' you think the front end of the car that you were in was within three feet of the south-bound main, or something like that? A. Yes sir, pretty close to that."

"Q. Pretty close to that? A. Yes sir."

"Q. When you were running 10 miles an hour, that would carry you about 15 feet in a second, would it not? A. I do not know, I never did figure it out."

"Q. It would carry you several feet, though, in a second, and it would not be, if you were running ten miles an hour, but a second or two before you were on this track, would it? A. No sir."

"Q. And you think the train was from 100 to 150 feet away? A. Yes sir, to the best of my judgment."

"Q. As soon as you saw it you jumped out? A. Yes sir."

"Q. And you could not clear the track? A. Yes sir, I was clear of the track of the north bound main."

"Q. Kind of in between the two? A. I hit right in between the south main track."

. . . . . . .

"Q. Now was this freight train along here, the back end of it, in a position that, from the automobile you were in, it hid this train coming up here? A. If it had been, it would have hid it."

"Q. It hid it there for awhile? A. Yes sir."

"Q. When you got up there, and somebody said 'here comes a train,' do you know how far the back end of this freight train was from this crossing? A. No, I don't."

"Q. You can't tell? A. No sir."

"Q. You don't know whether it had gotten so you could see the passenger train coming up or not? A. No, I—I never looked."

"Q. I say you don't know whether that freight train just barely got down far enough for you to see the passenger train past the back end of it, or not? How about that? A. Why, you could if you looked, looked close enough, you could see the

train over the freight train. How far down from the crossing was the freight train?"

"Q. My question was— A.—That is what I am trying to get straight."

"Q. My question was, when somebody said 'there comes a train,' you looked, as was the freight train far enough down that you could see the passenger approaching from behind the back end of the freight train? A. All I done, I looked around and seen the front of the engine, and I jumped out."

Now as to what happened after the accident, Mr. McMahon, the dining car conductor, testified as follows:

A. "When I got back to the car the Bennett girl was lying beside the car, toward the train. "She raised her arm and I started toward her, and she let her arm fall, and I knew she was gone. I heard this young lady here screaming. She came on down from the crossing, with a little blood on her forehead. I asked her: 'Where are you going?' She said: 'My God, I have killed her!' That was the remark she made. She said, 'I want to go down there and see her.' I said, 'No, you can't go down there,' and she came back to the road crossing. I had to take her by the arm and lead her to the road crossing."

"Q. What did she say? A. She kept saying, 'I killed her.' I said, 'No,' I said, 'Where's the driver of this car?' She said, 'I was driving it.' I said, 'How in the world did you get out?' She said, 'It threw me through the top.' I said, 'Didn't you see us coming?' She said, 'Yes, I tried to beat you.' Two or three ladies came out of a house, and I turned the young lady over to them, and I went back to the wreck to help get the Bennett girl out. We had to pick the car up off of her and lay her out on the embankment, for she was dying."

"Q. Captain, what part of the automobile hit the train? A. Through my experience with wrecks, it was the rear door, right at the wheel, indicating that the pilot had struck her in front of the rear wheel."

"Q. What would that indicate as to where the automobile was, as to the part of the car that was on the track? A. The rear part of the car was on our track, and the front of it over the track."

"Q. Which side of the track was the car on? A. The right side of the track, close to it, indicating that the engine hit it and knocked it over."

"Q. Had it approached the track from the other side? A. Yes sir."

"Q. State whether or not the engine pilot, and so forth, would cause objects striking it, on which ever side of the en-

gine they would strike it, to go off on that side? A. You know a pilot swings down on an angle, and when we strike an object, unless it hits it dead center and takes it down the track, if it hits away from the front, say on this side, then it is thrown from the track and it will knock it that way.''

"Q. That is the intention of it? A. It will throw it off the track. That is the reason it is built that way.''

"Q. That indicates that the car was nearly over the track? A. Yes sir.''

With reference to the action of the car when it was first discovered by the fireman, E. W. Rohan, he testified as follows:

"Q. State whether or not you saw that automobile approaching the track? If so, how far was it from the south main track— how far from the tracks? A. There was a freight train passing over the south main. I didn't see this car until in about 300 feet of the cars.''

"Q. Until you got in 300 feet of the crossing? A. 250 or 300 feet.''

"Q. Where was the car? A. Approaching the south main. There is a little rise near the track. It was in about 10 feet of the south main track.''

"Q. Was it moving on? A. Moving about four miles an hour.''

"Q. Tell the jury when you saw the car approaching what you did. A. I hollered to the engineer to sound the whistle again. He was sounding the whistle when he struck the car.''

"Q. What do you mean by 'sounding the whistle?' What was he doing? A. The alarm whistle.''

"Q. What we call the alarm whistle? A. Toot! Toot! Toot! Toot!''

"Q. Within what period of time from blowing the crossing whistle—two long and two short—about how long? A. About two seconds. We were running about 40 miles an hour.''

. . . . . . .

"Q. Did that car make any effort, or did you notice any effort on its part to stop? A. It slowed down, and then started jumping on.''

"Q. Where was the car when it started jumping? A. Right on the south main.''

"Q. Tell the jury what kind of movement it was making. A. Running about 4 miles an hour. When a car is in high, and you step on the gas, it will jump that way.''

"Q. When the car was on the south main, was it in striking distance of your train? A. I didn't know whether they were going to stop or not.''

"Q. When you saw it on the south main, was it in a position to be struck by your train if it had stayed there? A. ·Not if it had stayed there."

"Q. You noticed it on the crossing when it commenced jumping—Are you familiar with automobiles? A. No sir. ·

"Q. Do you know, when you apply the gas when they are going slow, what effect that will have on them? A. I know what they tell me."

"Q. What do you know? A. I noticed the car started jumping."

"Q. Did it pick up speed. A. I noticed it picked up speed."

"Q. What part of the car was struck, Mr. Rohan? A. I am not sure about that; on the rear end, I think."

"Q. It was evidently passing over the track, and the rear end of the car was struck? A. Yes sir."

"Q. When you observed it was not going to stop, was anything else done? A. I put the brakes on myself."

"Q. How far away? A. About 100 feet from the crossing. I saw the car was going on across."

"Q. You applied the brakes? A. Yes sir."

"Q. In what way? A. The emergency."

"Q. What does that mean? A. That makes every effort to stop, with all the force we have got, by application of the brakes."

"Q. The brakes put into emergency applies all the braking power of the train to the brakes? A. Yes sir."

. . . . . . .

## Cross-Examination.

"Q. Now you say after you saw this automobile there, after you passed the caboose on the freight train on that track over there that you were about 300 feet from this crossing? A. Yes sir."

"Q. Then it took you about five or six seconds to get from where you were onto this crossing? Then it was about like that, (snapping fingers five times) until you were up here on this crossing? A. Yes sir."

"Q. Then you waited until you were about two-thirds of that distance before you applied the brakes? A. When I seen the car increasing its speed."

"Q. The car was coming right up on the track when you first saw it? A. I didn't know the car was going across."

"Q. You didn't know it was going across until you saw it keeping on over there? A. No sir."

"Q. When you first saw it it was coming up on this South main? A. Yes sir."

"Q. And then you waited before you put on the brakes until you were in about 100 feet of this crossing? A. 100 to 150 feet. I saw the car going across and I applied the brakes in emergency."

"Q. You went 100, or about 150 feet—you ran 150 to 200 feet from the time you first saw it? That would have been two or three seconds from the time you first saw it until you put the emergency in? A. I didn't know the car was going across until it started across the crossing. If we stop every time we see a car, we would be stopping all the time coming up to a crossing."

"Q. You say it was coming up on the South main? A. Crossing the south main."

"Q. How close to the south main? A. In about five feet of the south main, and moving all the time."

"Q. And moving all the time; and you applied the brakes when you were in about 100 to 150 feet, and you hollered to the engineer to blow the whistle, and he got hold of it and was blowing when he hit the car? A. When I seen the car approaching the track I hollered to the engineer to blow the alarm whistle, which he did, and he was blowing the alarm whistle when I was applying the brakes in emergency, when I seen the car was coming across the track in front of us."

"Q. How long does it take you, when you see an object appear at the side of the track, how long would it take you to have called over there, you as fireman, to call over to the engineer and have him blow his whistle? How many seconds? A. As soon as I hollered he blew the whistle."

"Q. How many seconds would it take? A. About a second, I suppose."

"Q. Well, if you on your engine could not see this car until it was within four or five feet of the south main after the other train passed, the people in that car could not see your train coming either, could they? A. I don't suppose they could, no sir."

This fireman says that the brakes and machinery were in perfect working order; that they had been tested at Somerset; that he was on the lookout ahead, and they were making about forty miles an hour. That they made a test of the crossing signal bell, etc., right after the accident, and found that they were in perfect working order and responded when they backed up.

It would seem very clear from this that only the freight train obscured the vision of those in the car of the passenger train approaching on the north main, and that the automobile was slowed down and the freight passing when it was discovered by the fireman

west of and near the south main; and thereupon the alarm whistle was sounded when the train was about 300 feet away; that this was when Coleman said "step on it," thinking, no doubt, that they could beat the train across the track thirteen to fifteen feet away. But Burton figured that they could not do it, and jumped out, landing between the rails of the south main. That when the automobile started up the plaintiff also became panicky and tried to get out of the car, which may have saved her life, as she was enabled to get clear of the entanglement of the seat and steering gear, and was thrown out.

We are aware, however, that in passing upon this case it is the jury's province to determine any controverted question, and therefore this case must be determined upon the best possible light in which it was presented by the plaintiff's proof, and that is her own testimony, which stands alone against the overwhelming proof that there was nothing to obstruct the vision but the passing freight train, and she must even, in this extremity, resort to its noise in the argument of the case to excuse her not hearing the ringing of the bell or the sounding of the whistle. The material part of her evidence goes only to the denial of her statement to the conductor that it was her fault, and that she was sorry or distressed that her friend was killed because of her fault, and to the alleged embankment and weeds which, according to her contention, obscured her vision of the train approaching from the south before she reached the tracks. She does not deny that she told the conductor (McMahon) when he asked her "didn't you see us coming?" that she replied "yes, I tried to beat you," unless it was done inferentially in reply to questions propounded to her in her cross examination, as follows:

"Q. He said 'step on the gas? A. Yes sir."

"Q. And you undertook to step on the gas? A. Yes sir."

"Q. To get across the track? A. No sir, I didn't, because the train was right upon us then, and I only had time to jump."

Her contention was that she was struck on the first track. There is no contention that she could not see after she reached the first track, or that there was any embankment or weeds or other things to obstruct the vision after she came upon the little level which she says existed before reaching the first track. Even after they were up on the first track, according to her contention, she was driving very slowly. When she got upon the first track the train was certainly visible, and before, as the fireman saw her, and the alarm was sounded. The automobile could have been stopped there, or before reaching the second track, as might have been expected that it would be, with a train 300 or 150 feet away running forty miles an hour. Mr. Leigh, who was an eye witness, says the automobile was stopped, or standing still; but she says she never stopped, but was driving slowly. It

must therefore be taken that it was never stopped, but we think it must likewise be taken that it could have been stopped, or that she was negligent in driving the car upon the track at a rate of speed when she could not have stopped had the occasion of the proximity of the train required it.

The proof shows from her testimony that it could have been stopped within seven feet, and it appears that the train could not have been stopped after her expeditious discovery, even when the passenger was 300 feet away from the crossing.

All the other proof shows that she was blind to every signal of danger before she reached the track, to the ringing of the bell, the wigwagging arms, the passing freight and the double track itself, which was a proclamation of danger. However, considering, as we must, that there is an embankment and weeds which obscured her vision, and that she looked and listened, and discovered all that was discoverable by that means before the automobile reached the south bound main, the approaching train certainly was discoverable after she reached the track, and failing to discover it would show that she did not look at that time, as was her duty to do and have the automobile under control so she could stop. And if, as she contended, the freight train was not there, she might have seen the passenger after she got up on what she concedes was a short level space before reaching the first track, for a long way down to the south, in ample time. Or, if it was there, she should have waited until it got out of the line of her vision, to discover if the other track was safe, before placing herself in a condition of irrevocable peril in relation to the other track. It is manifest from her testimony that the only looking and listening she did was before she reached the first track, because in her cross examination she assigns as the reason for not seeing, the bank which she says prevented her. Taking her statement, therefore, that she looked and listened as she approached the first track, and that because of an embankment and weeds she could not see the train until she got up near or on the track, she drove upon it without stopping to listen, when she says the train was so close she could not get off. Manifestly, therefore, there could be but one opinion; that this was negligence under her contention, because the rule is, that if you can not see, you must listen; and if there is anything that might prevent you from hearing, you must stop and listen, which she did not do. It is argued for her here that she was driving slowly, and that the noise of her car would not have prevented her hearing, or that it should have been thought so; or that even the noise of the freight, which she says was not there, prevented her hearing the bell or whistle. This makes it mainfest, and is practically a concession, that she should have stopped. Her confusion and uncertainty as to how it occurred, did not raise

her evidence to the dignity of a conflict. At best it could only show that she perfunctorily looked and listened, without stopping her car, going at the rate of about nine or ten miles an hour, and entered upon the track without any proper investigation to see if a train was approaching. She states that when she came upon the track she could see. Even then, according to her own testimony, she could have stopped the automobile, she says within seven feet, which would have been before reaching the other track; but instead of that she stepped on the gas at the suggestion of Coleman, who no doubt thought, as stated, that by so doing they could beat the train over. But she says she stepped on the gas not to get over, but presumably to get off. She mainfestly confused the first track with the second, according to her testimony, and after stepping on the gas at Coleman's suggestion, tried to jump from the car. Had she remained where she was, of course no collision would have occurred; or, as she had undertaken the venture, had she not abandoned her supervision of the car, but continued stepping on the gas, the car might have sufficiently cleared the track.

The proof, we think, under any proper analysis, is such as to show that this injury was due solely to the negligence of the plaintiff. While she only states that she did not hear the whistle or any bell, all the other proof shows that the crossing whistle was sounded, and the alarm whistle sounded, and the dining car conductor says the electric gong was sounding as his coach passed over the crossing.

It is also proper to state that from the proof Kentucky has no such statute as ours, and that the duties and liabilities of the defendant must be determined upon the principles of the common law, under which negligence must be proved. It is not perceived that anything else could have been reasonably done to have prevented this accident, short of having someone at the crossing to interpose an objection to their going upon the track. The defendant had installed the electric bell and wig-wagging system, which were in operation at the time. They had sounded the crossing signal at the crossing south of the one where the accident occurred, and as soon as the plaintiff's car was visible when the freight train had gotten by, sounded the alarm whistle, and seeing the car was not going to stop applied the brakes in emergency, and everything was done that might have been reasonably expected under the circumstances. It is not a question of fact under such circumstances as these to be submitted to the jury, when all the proof shows that this was done, and the only proof negativing it is that they were not seen or heard, and, too, when the plaintiff is forced to resort to the circumstance of the freight train, which she says was not there, to excuse her not hearing. It is not material what the court said to the jury in directing their verdict, if as a matter of fact the record justified his tak-

ing the case from them. We think that when the testimony of the plaintiff is properly confined and analyzed, it shows no conflict with the other testimony, except upon points which might be eliminated altogether, and still there could be but one opinion; that after going upon the first track and the discovery of the train, or when it might have been discovered, there was time for her to have stopped the car and to have prevented the accident; and, upon the other hand, there was not time for the train to have been stopped after any reasonable apprehension that the automobile was going to cross over.

The proof fails to show that the defendant was guilty of any negligence. The authorities cited by the plaintiff in error are not in point. The assignments of error are not supported. They are therefore overruled, and the judgment of the lower court affirmed, with costs.

Portrum and Thompson, JJ., concur.